**In re Duane Ronald WITT, d/b/a Witt Feedlot, f/d/b/a Sioux Enterprises, and Betty Joan Witt, Debtors.**

**Bankruptcy No. 83–04283.**

United States Bankruptcy Court, N.D. Iowa, W.D.

April 21, 1986.

John Harmelink, Yankton, S.D., for debtors.

A. Frank Baron, Sioux City, Iowa, for Farmers State Bank.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court to consider confirmation of the Debtor's Second Amended Plan of Reorganization filed on February 13, 1986, and to consider the Mo-

tion to Dismiss, initially filed December 28, 1984, and renewed on February 3, 1986, by Farmers State Bank of Hawarden, Iowa (BANK). The Second Amended Plan has been accepted by the Class 2 creditor, First State Bank of Hawarden, Iowa, which holds a secured claim in the amount of $1,675.34. The Debtor proposes to pay this creditor $1,600.00. First State Bank's claim was treated as an unimpaired claim in the Debtor's First Amended Plan filed August 15, 1985, and it was to receive the full value of its claim, $1,619.73, when the note becomes due. Farmers State Bank is the only creditor which has voted to reject the Plan. $357,120.00 of the Bank's claim is treated as a Class 1 secured claim, and $106,855.00 of its claim is included with the Class 3 unsecured claims. Consequently, neither Class 1 nor Class 3 has accepted the Plan, and Class 2 is the only accepting class.

The Debtor filed a Motion For Confirmation of the First Amended Plan pursuant to 11 U.S.C. § 1129(b)(1). The First Amended Plan came on for confirmation January 29, 1986, before the undersigned, sitting by special designation. At that time, no impaired class of creditor had accepted the Plan, and the Court indicated that failure of at least one class to accept would cause a problem with cram down. At that January hearing, counsel for the Debtor said that treatment of the unimpaired claim of First State Bank would be changed so that it would be impaired. Shortly thereafter, the Debtor filed and circulated a Second Amended Plan of Reorganization, which included First State Bank as an impaired creditor with First State Bank accepting its proposed treatment of being paid $1,600.00 of its $1,675.34 claim. On March 5, 1986, the Debtor again moved the Court for confirmation pursuant to section 1129(b)(1).

The Bank objects to confirmation of the Second Amended Plan on the following grounds: (1) the absolute priority rule of section 1129(b)(2)(B)(ii) prohibits confirmation of the proposed Plan; (2) the Plan is not feasible as required by section 1129(a)(11); (3) the Debtor has not complied

with all of the applicable provisions of title 11, as required by section 1129(a)(2) because reports, as required by Local Rule 6003(c), have not been filed; and (4) the Plan is not proposed in good faith as required by section 1129(a), because the Debtor's impairment of the Class 2 creditor is artificial and not a substantial impairment.

The Debtors, Duane and Betty Witt, filed their Chapter 11 Petition on October 8, 1983, and have been in bankruptcy for approximately 2½ years. Mrs. Witt passed away unexpectedly in early 1985. The Second Amended Plan came on for confirmation before the undersigned on March 12, 1986. The Debtor's brief was due within 15 days, and Farmer State Bank's response brief was due 5 days thereafter. Debtor's counsel, on April 7, 1986, filed a Motion to reject the Bank's brief, apparently believing both briefs were to be simultaneously filed. However, such was not the case, and the Bank's brief was intended by this Court to be a response brief.

## FINDINGS OF FACT

The Debtor, Duane Witt, has been engaged in farming and livestock feeding since 1952. The Debtor currently owns 260 acres of land acquired by purchase and inheritance and farms an additional 220 acres owned by his mother. 416 acres of this land is tillable and is used to grow corn, soybeans and alfalfa.

Finding the cattle feeding business unprofitable, the Debtor sold his cattle in 1977. In 1976, the Debtor expanded his hog operation and built a large farrowing facility. The Debtor's sow numbers increased from 90 in 1976 to 240 in 1983. Losses from the cattle feeding operation, poor crops in 1975 and 1976 caused by drought, and poor hog prices have all contributed to the Debtor's financial problems.

In the Debtor's First Amended Plan, filed August 15, 1985, the Debtor proposed to pay the Bank on December 1, 1985, interest accrued since confirmation of the Plan. On December 1, 1986, and each year thereafter, the Debtor proposed to pay the Bank $62,160.40 until total payments of $1,242,328.00 were made.

The Debtor's First Amended Disclosure Statement, also filed August 15, 1985, contained a projected summary of 1985 income and cash flow. This projection, which contemplated a Plan confirmation by the end of 1985 and which also contemplated $18,000.00 of payments to creditors, showed a cash flow surplus at year end of $11,007.00.

The Debtor's monthly statements do not clearly reflect the actual income and expenses for the Debtor in 1985. The file contains no report for May of 1985. Likewise, the figures on the February report are identical to the January report. In addition, the Debtor has combined payments for rent and interest, which makes it difficult to adjust the $18,000.00 projected creditor payments for 1985. The Debtor's reports indicate that approximately $450.00 was paid on a note in March and that approximately $6,000.00 was paid for rent and interest for 1985. Because $6,000.00 is the amount of rental payments which were projected, the Court will consider the $6,000.00 paid under the category of interest and rent to be mainly for rent and interest on rental payments, and not any of the payments to creditors which the Debtor had projected to be $18,000.00.

Without deducting for projected $18,000.00 creditor payments for 1985, because the Plan was not confirmed and they were not made, the Debtor's projections indicate that $29,007.00 should have been remaining at year end. Instead, $5,405.36 cash was on hand. Duane Witt testified that he has 10,000 bushels of corn, on which the Bank claims a lien, on hand which if sold would have allowed him to meet his projections.

The Court is unclear as to the exact nature of Exhibit D, introduced at trial, which is entitled "Projected Farm Income and Expenses—1985 and Subsequent Years". This schedule appears to have been inaccurately entitled "1985 and subsequent years", and the Court believes it should have been entitled "1986 and subse-

quent years". The schedule appears to simply be a revision of Exhibit B in the Disclosure Statement which projected farm income and expenses for 1986 and subsequent years. The Court also believes that the reference to 1985 cash flow and surplus on Exhibit D should have been labeled 1986 cash flow and surplus.

Although Exhibit A in the Disclosure Statement, which projects 1985 farm income and expenses, would appear close to being met by the Debtor if he was able to sell his corn on hand, one significant projection was not met. The Debtor's sow numbers did not increase to 220 head as projected but are currently at 90 head. The Debtor's 1986 cash flow is based on a 220-sow operation. Elwood Iverson, agricultural representative for the Bank, testified that it would take 11 months to build sow numbers to 220 head, with another four months necessary to get them to market. However, the Debtor said it would take 6 months and believed he had the assets to do it. Although the Debtor's projected net crop income and feed costs are reasonable, he will be unable to obtain the hog production necessary to meet his projections.

Instead of making payments on December 1, 1986, as proposed under the First Amended Plan, the payments have been moved back to 1987 under the Second Amended Plan, as the Bank is projected to receive $17,120.00 on December 1, 1986, instead of the $62,116.40 payment which was proposed under the earlier Plan. The Debtor has not, in recent years, had $70,-000.00 after operating expenses as would be needed to make annual plan payments.

## CONCLUSIONS OF LAW

A proposed plan of reorganization must meet all requirements of section 1129(a) and cannot be confirmed without approval of all impaired classes of creditors unless the plan is capable of "cram down" pursuant to section 1129(b) of the Bankruptcy Code. *See In re Hoff,* 54 B.R. 746, 751 (Bankr.D.N.D.1985). Because Class 1 and Class 3, both impaired, have voted to reject the Plan, confirmation pursuant to section 1129(b) is the only option for obtaining a confirmed plan. A plan may be confirmed under section 1129(b) only if the Court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each class of impaired claims which have not accepted the plan and all provisions of section 1129(a), except for paragraph (8), have been met. *Id.; see* 11 U.S.C. § 1129(b)(1).

Section 1129(b)(2)(B) requires that for a plan to be fair and equitable with respect to a class of unsecured creditors, the following is necessary:

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B). The requirement of section (i) is not met under the Plan because the unsecured creditors will only receive 50% of their unsecured claims.

The alternative requirement of section (ii) is commonly referred to as the absolute priority rule. *In re Potter Material Service, Inc.,* 781 F.2d 99, 101 (7th Cir.1986). In the corporate context, junior claim holders, which includes shareholders, are clearly prevented from retaining any ownership interest, albeit valueless if a liquidation were to occur, unless creditor classes receive the full value of their claim or have approved the plan. *Matter of Huckabee Auto Co.,* 33 B.R. 132, 141 (Bankr.M.D.Ga.1981); *In re Landau Boat Co.,* 8 B.R. 436, 438 (Bankr.W.D.Mo.1981). One exception is when substantial new capital is invested into the reorganized business. *In re Potter,* 781 F.2d at 101. Although the majority of courts which have adopted the absolute priority rule have done so in the corporate or partnership context, others have recently held the rule

to be equally applicable in a sole proprietorship context. *In re East*, 57 B.R. 14, 17 (Bankr.M.D.La.1985); *In re Pecht*, 53 B.R. 768, 772 (Bankr.E.D.Va.1985); *In re Knutson*, 40 B.R. 142, 144 (Bankr.W.D.Wis. 1984). The court in *In re East* analyzed the absolute priority requirement as a built-in check to prevent equity owners from playing a valuation game and retaining property of a present or ongoing concern value greater than the valuation for confirmation purposes. *In re East*, 57 B.R. at 18. The *East* court stated that if property has no ongoing concern value, a rational businessman would liquidate and not reorganize. *Id.* Although perhaps true in the rational business world, the Court does not believe such analysis is true in the farm reorganization context. A desire to remain on the family farm, to till the soil, and to continue with a way of life is the reason that most farmers wish to reorganize. Except for some limited exceptions, most farm operations have no ongoing concern value above a liquidation value, once adjusted for liquidation expenses. This Court does not believe the absolute priority rule is appropriate in agricultural bankruptcies and realizes that it makes agriculture reorganizations extremely difficult. Nevertheless, it is clearly the law, as the Bankruptcy Code and case law indicate, and if the law is to be changed. Congress must do so.

The Bank also objects that the reclassification of the claim of the First State Bank is not in "good faith" as required by section 1129(a) and that the attempt to impair the claim by $19.00 plus interest is not meaningful.

■ "[Good faith] is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code'." *Matter of Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal. 1982)). Although good faith is difficult to define, a bankruptcy judge, in considering the totality of circumstances, is in the best position to assess the good faith of a proposed plan. *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984).

A number of cases have not permitted classification of claims in particular classes for the sole purpose of obtaining a consenting class as required to invoke cram down. *In re S & W Enterprise*, 37 B.R. 153 (Bankr.N.D.Ill.1984); *In re Mastercraft Record Plating, Inc.*, 32 B.R. 106 (Bankr.S. D.N.Y.1983); *In re Pine Lake Village Apartments Co.*, 19 B.R. 819 (Bankr.S.D. N.Y.1982). The above cases prohibited classification of claims for the sole purpose of gerrymandering the creditor's vote. *Matter of U.S. Truck Co., Inc.*, 47 B.R. 932, 939 (E.D.Mich.1985). The Court is not aware of any cases, however, where treatment of an unimpaired claim was insignificantly changed so that the claimholder would become impaired and thus qualified to vote for purposes of obtaining acceptance by a class of creditors.

■ For all practical purposes, First State Bank's claim is not impaired as First State Bank would be receiving $1,600.00 under the Plan instead of approximately $1,675.00. Nevertheless, section 1124 of the Code quite clearly sets forth the criteria for determining whether a claim is unimpaired. "A class is unimpaired if the plan leaves unaltered the legal, equitable, and contractual rights". 3 Norton Bankr.L. & Prac. § 62.06 (1986); *see* 11 U.S.C. § 1124. "In other words, if the plan does nothing to the claim or interest then it is unimpaired. There should be no difficulty in applying this standard". 3 Norton Bankr.L. & Prac. § 6206 (1986). Although Norton's commentary suggests that even minor impairment of a claim is sufficient and proper to establish that a claim is impaired, other commentary differs. In interpreting section 1124, Bankruptcy Service, Lawyers' Edition, states:

"The concept of 'impairment' under 11 USCS § 1124 presumes a class of claims or interest to be impaired unless, *essentially*, either the legal, equitable, and contractual rights to which such claim or

interest entitles a holder of such claim or interest are left unaltered ..."

Bkr.L.Ed., Commentary and Analysis § 42.-30 (1979) (emphasis added). Although under section 216 of the old Bankruptcy Act, applicable in former Chapter X cases, impairment needed to be "material and adverse", the Code makes the impairment standard much less difficult to meet than it was under the old Act. 5 Collier on Bankruptcy ¶ 1124.02 and ¶ 1124.03 (15th ed. 1985). Accordingly, the Court concludes that even though First State Bank's claim under the Plan is not significantly impaired, it is impaired as contemplated by section 1124 of the Code, and therefore Class 2 has accepted the Plan.

Although the Bank's other objections perhaps have merit, the absolute priority rule prevents confirmation of the Plan; and a discussion of the other objections is not essential to disposition of this matter.

The Bank has also moved the Court to dismiss the case pursuant to section 1112(b). Section 1112(b) provides that the Court may dismiss a case for cause including (1) continuing loss to or diminution of the estate in absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; and (3) unreasonable delay by the debtor that is prejudicial to creditors. *In re Hoff,* 54 B.R. at 754. The Court has judicial discretion to decide what might constitute cause in a particular case. *In re Galvin,* 49 B.R. 665, 668 (Bankr.D.N.D. 1985).

■ The facts of this case establish sufficient cause for dismissal. Three Plans have been filed, none of which are capable of confirmation. In addition, the evidence presented at the confirmation hearing clearly shows that the Debtors' operation is not "geared up" to the level of producing sows necessary to meet the 1986 projections. Payments which were contemplated to be made near the end of 1986 have now been moved to the end of 1987. If allowed to continue in bankruptcy, the 1987 date would most likely be moved back again.

The Court is sympathetic to the Debtor's cause, especially in view of the sincere effort to reorganize amidst many hardships. However, the Debtor has had sufficient time to reorganize as the third anniversary of this case is fast approaching. As is the case with so many farmers such as the Debtor, the drive, good intentions, and sincere hope of reorganization are present, but the numbers simply are not. Even if the Court would allow this case to remain in bankruptcy for a longer period of time, the chances for a successful reorganization are extremely remote. Although the goal of a Chapter 11 reorganization case is a confirmed plan, even a confirmed plan would by no means solve the Debtor's problems. If a plan payment is missed, he would again have the same problems he had prior to bankruptcy.

■ The Bankruptcy Code does not guarantee successful reorganizations, nor does it provide a framework within which a debtor may indefinitely operate. It only provides a breathing period for a debtor to attempt to reorganize. The Bankruptcy Court has generously protected the Witt farm for over 2½ years during which efforts to reorganize have been unsuccessful. The time has come when the Debtor must face the reality of his operation. Accordingly, and for the reasons stated herein,

IT IS HEREBY ORDERED that the Debtor's Motion to reject the brief of Farmers State Bank of Hawarden, Iowa, is DENIED, the Application for Confirmation of the Debtor's Plan of Reorganization pursuant to section 1129(b) is DENIED, and the above-entitled case is hereby DISMISSED ten days following entry of this Order.